**MARCOS v. UNITED STATES.**

No. 50278.

United States Court of Claims.

Decided July 15, 1952.

Whitaker, J., dissented.

174

Harold H. Martin and John Ward Cutler, Washington, D. C. (George A. Nugent and Prew Savoy, Washington, D. C., on the brief), for plaintiff.

S. R. Gamer and Thomas O. Fleming, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen. (Harry Davidson and Bernard Wohlfert, Washington, D. C., on the briefs), for the defendant.

Shearman & Sterling & Wright, New York City, amicus curiae for Oerlikon Machine Tool Works Buehrle & Co., plaintiff.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

HOWELL, Judge.

On February 5, 1952, this court 102 F. Supp. 547, denied defendant's motion to dismiss plaintiff's petition as being barred by the Statute of Limitations, 28 U.S.C.A. § 2501, 62 Stat. 976. We concluded that the outbreak of war in the Philippine Islands on December 8, 1941, suspended the normal operation of the Statute of Limitations that this suspension was lifted on September 2, 1945, by the formal surrender of Japan, and that Filipino claimants, such as plaintiff, whose causes of action arose after the outbreak of hostilities and during the period of the suspension of the Statute of Limitations, had six years following September 2, 1945, within which to institute action in this court. Hence, plaintiff's suit to recover the value of cattle allegedly requisitioned by the United States Army, having been filed on August 14, 1951, was held not to be subject to the defense of limitations. Thereafter, defendant filed a motion for a new trial, which might have been more properly designated a motion for rehearing, and because of the importance of the issues involved, and the number of similar cases now pending, the court agreed to hear additional oral argument upon this subject.

Defendant first urges that this court's present Statute of Limitations, Section 2501 of recently revised Title 28, does not contain an enumeration of any specific disabilities but broadly provides that all legal disabilities shall give rise to a three-year period following their removal within which to file suit. Defendant insists that war is a disability within the meaning of this comprehensive language and, accordingly, that following the end of World War II in the Philippine Islands claimants such as plaintiff had only three years within which to file their suits against the United States.

This argument is predicated upon two false assumptions. First, war is not a legal disability and prior to the 1948 revision of Title 28 had not been treated as such. Cf. Campbell v. United States, 13 Ct.Cl. 108. Second, we are unable to find any indication that Congress in drafting Section 2501 intended to change this interpretation so as to include war as a disability. Section 2501, which forms the basis of defendant's argument, provides in part as follows:

"Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed, or the claim is referred by the Senate or House of Representatives, or by the head of an executive department within six years after such claim first accrues.

\* \* \* \* \* \*

"A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases."

As we pointed out in our earlier decision, Section 2501 replaced 28 U.S.C. (1946 Ed.) § 262, 36 Stat. 1139, which was in effect at the time plaintiff's cause of action accrued. Section 262 provided as follows:

"Every claim against the United States cognizable by the Court of Claims, shall be forever barred unless

the petition setting forth a statement thereof is filed in the court, or transmitted to it by the Secretary of the Senate or the Clerk of the House of Representatives, as provided by law, within six years after the claim first accrues. The claims of married women, first accrued during marriage, of persons under the age of twenty-one years, first accrued during minority, and of idiots, lunatics, insane persons, and persons beyond the seas at the time the claim accrued, entitled to the claim, shall not be barred if the petition be filed in the court or transmitted, as aforesaid, within three years after the disability has ceased; but no other disability than those enumerated shall prevent any claim from being barred, nor shall any of the said disabilities operate cumulatively."

The reasons for the change in the language of Section 262 to that now contained in Section 2501, supra, are set forth in the Reviser's Note to Section 2501, and are as follows:

"Words 'a person under legal disability or beyond the seas at the time the claim accrues' were substituted for 'married women first accrued during marriage, of persons under the age of twenty-one years first accrued during minority, and of idiots, lunatics, insane persons, and persons beyond the seas at the time the claim accrued; entitled to the claim,'. The revised language will cover all legal disabilities actually barring suit. For example the particular reference to married women is archaic, and is eliminated by use of the general language substituted.

"Words 'nor shall any of the said disabilities operate cumulatively' were omitted, in view of the elimination of the reference to specific disabilities. Also, persons under legal disability could not sue, and their suits should not be barred until they become able to sue. * * *"

■ It is significant that both the statute and the Reviser's Note are careful to speci-

fy that Section 2501 applies to "legal disabilities." The term "legal disability" has had a fixed and well-defined meaning since provision for relief therefrom was first made in 1623 in the Statute of 21 Jac. I, c. 16. In fact, the "legal disabilities" enumerated in the earlier versions of this court's Statute of Limitations,[1] viz., claims of married women, infants, insane persons, and persons beyond the seas, were the same as those enumerated in the English Statute of 1623.

■ While war is in the nature of a disability, it has never technically been regarded as a "legal disability" within either the coverage of the disability provision of this court's Statute of Limitations or within the general law usage of the term. There is no indication that Congress intended to depart from this well-defined meaning to include war as a disability when it substituted in Section 2501 the general expression "legal disability" in place of the specific conditions heretofore denoted by this expression. Rather, it is apparent from the Reviser's Note that Congress was primarily endeavoring to bring the Statute up to date by eliminating the reference to the outmoded disabilities such as coverture. We conclude that the revision contained in Section 2501 does not embrace the situation presented by the existence of war.

■ History supplies the principal explanation as to why the effect of war on the Statute of Limitations developed independently of the provision for legal disabilities. At the time of the passage of the original English Statute of Limitations in 1623, the common law regarded all debts, contractual rights, and property rights of subjects of nations at war as being canceled and subject to confiscation by the warring governments. Thus, no reason existed for the inclusion of war within the disability provision of the Statute of 1623, and the lawmakers of the day never thought of providing for the collection or restoration of these rights with the return of peace between the belligerents. Hanger v. Abbott, 6 Wall. 532, 18 L.Ed. 939; Greenwald v. Appel, C.C., 17 F. 140. As the views of the civilized world gradual-

---

1. Cf. 12 Stat. 767, R.S. § 1069 (1878), 36 Stat. 1139.

ly changed with respect to the conduct of war, the modern day practice evolved to *suspend* absolutely the rights and remedies between citizens of countries at war, so as not to provide aid for the enemy, and to revive the rights and remedies upon the restoration of peace instead of confiscating them. Today it is a firmly established principle of international law that the outbreak of war by implication suspends the *normal operation* of the Statute of Limitations in the case of persons to whom the courts are closed or inaccessible, and this rule extends not only to enemies but also to residents of enemy-occupied countries such as the Philippine Islands. Cf. (Note) 137 A.L.R. 1454, et seq.

 As a result of its historical background, the treatment afforded the suspension of the running of the Statute of Limitations occasioned by the existence of a state of war has developed in a manner which materially differs from the treatment afforded to legal disabilities. There are several cogent reasons why courts have seen fit to create and perpetuate these differences. Generally it is stated that the effect of the running of the Statute of Limitations upon a cause of action is to destroy the *remedy* but not the *right*. 34 Am.Jur., Limitation of Actions, § 11. The effect of the legal disability provision of a Statute of Limitations is to restore this *remedy* for a designated period beyond the normal period of limitations. However, the effect of war is to suspend not only the *remedy* but also the *right* to sue as well. The right and the remedy are suspended in *status quo,* and at the cessation of hostilities are restored to the litigant. The result which necessarily would be achieved if war were treated in any other manner is pointed out by the Supreme Court in Hanger v. Abbott, supra. The Court stated, 6 Wall. at pages 538 and 542, 18 L.Ed. 939, that:

> "Unless we return the remedy with the right the pretence of restoring the latter is a mockery, as the power to exercise it with effect is gone by lapse of time during which both the right and the remedy were suspended.
>
> \* \* \* \* \* \*
>
> "\* \* \* Peace restores the right and the remedy, and as that cannot be

if the limitation continues to run during the period the creditor is rendered incapable to sue, it necessarily follows that the operation of the statute is also suspended during the same period."

Similar statements are contained in United States v. Wiley, 11 Wall. 508, 20 L.Ed. 211; Levy v. Stewart, 11 Wall. 244, 20 L.Ed. 86; Borovitz v. American Hard Rubber Co., D. C., 287 F. 368; Siplyak v. Davis, 276 Pa. 49, 119 A. 745; cf. Frabutt v. New York, Chicago & St. Louis Railroad Co., D. C., 84 F. Supp. 460, 464.

 Another basis for the difference in the treatment of war and of legal disabilities with respect to the Statute of Limitations lies in the factors which give rise to these conditions. The legal disability provisions of Statutes of Limitations are designed to provide relief from some personal handicap or impediment affecting the individual litigant and preventing him from bringing a timely suit. Such provisions are based on the presumption that the courts are open and that every litigant free of such a handicap will not unreasonably delay in filing suit. If the cause of action accrued to the litigant prior to the occurrence of the disability, the disability affords no relief from the running of the Statute because the litigant has had some period of time prior to the occurrence of the disability within which to file suit. De Arnaud v. United States, 151 U.S. 483, 14 S.Ct. 374, 38 L.Ed. 244; Whitney's Adm'x. v. United States, 18 Ct.Cl. 19. In order to bring the disability provision into operation, the litigant must be under the disability at the time the cause of action accrues. The effect of the disability provision in many statutes of limitations, and especially in Section 2501 of Title 28, is *not to suspend* the running of the Statute during the period that the disability continues, but is to create a designated *additional* period, a period of grace, beyond the normal period of limitations within which to file suit after the removal of the personal defect.

 On the other hand when a suit cannot be filed within the normal period of limitations because of the existence of a state of war, the result is not attributable to any

personal defect of the claimant, but rather to the international acts of nations for which all citizens are responsible. A superior power closes the courts to litigation with the enemy during such a period. The effect of the outbreak of war is to *suspend the normal operation* of the Statute of Limitations, and with the return of peace the Statute revives and continues. to operate in the normal manner. This result is contrary to the way in which legal disabilities affect the Statute. The legal rule heretofore applied to war by English and American courts does not allow the Statute to continue to run during the existence of hostilities, and does not provide an additional period following the end of the war within which to present suits. Instead, the rule simply suspends the Statute in *status quo* as of the time hostilities occur. Thus, if the cause of action accrues after the outbreak of war, the party has the full normal period of limitations after the end of the war within which to sue. If the Statute has begun to run before the outbreak of war, the period during which war lasts is deducted in computing the normal period of limitations. As this position has been consistently followed by the Supreme Court, Brown v. Hiatts, 15 Wall. 177, 21 L.Ed. 128; Semmes v. Hartford Insurance Co., 13 Wall. 158, 20 L.Ed. 490; Braun v. Sauerwein, 10 Wall. 218, 19 L.Ed. 895; we can conceive of no reason for adopting an inconsistent interpretation in the present action.

In urging the contention that war is a legal disability giving rise to only a three-year period following the return of peace within which to institute suit, defendant has disregarded the consequences of such a construction upon causes of action accruing prior to the start of war. The case of Tan v. United States, D.C., 102 F.Supp. 552, presents an example of such a situation. Plaintiff Tan's cause of action against the United States Army accrued on November 3, 1941, and the Statute of Limitations began to run against it at this time. War broke out in Manila on December 8, 1941. If we were to adopt defendant's contention and were to conclude that war is a legal disability, the outbreak of war would have no effect on Tan's cause of action because, as indicated above, once the Statute has begun to run, intervening legal disabilities do not give rise to an additional period of grace following the removal of the disability within which to bring suit. To reach such a conclusion, we would have to disregard the fact that resort to this court by Filipinos was both impossible and illegal during the period here in question. It is clear that defendant's argument is erroneous and is contrary to the more logical conclusion reached in the leading decisions which have considered this problem. We, therefore, reaffirm the principle adopted in our earlier decision in this case that war, unlike "legal disabilities," impliedly suspended the normal operation of the Statute of Limitations, and that with the return of peace, plaintiff, whose cause of action accrued after the outbreak of war, had six years within which to file his suit.

The fact that plaintiff was an "enemy" under the definitions of the Trading With The Enemy Act, 40 Stat. 411, as amended, 50 U.S.C.A.Appendix, §§ 1–39, does not alter our above-stated conclusions. Rather, we find that Congress expressly provided in Section 8(c) of the Act that the running of the Statute of Limitations should be suspended in certain designated situations, not herein material, and then concluded as follows:

"* * * *Provided, however*, That nothing herein contained shall be construed to prevent the suspension of the running of the statute of limitations in all other cases where such suspension would occur under existing law."

In enacting this provision Congress had before it, as part of the Senate Reports accompanying the bill, a legal memorandum which listed the authorities holding that war suspended the operation of the Statute of Limitations. S.Rept. 111, 65th Cong., 1st Sess., pp. 21, 22; S.Rept. 113, 65th Cong., 1st Sess., pp. 21, 22. In light of the fact that Congress was fully informed of the leading decisions, it is our opinion that Congress did not intend by enacting the Trading With The Enemy Act to alter the existing state of the law, but merely intended, by incorporating Section 8(c) into the Act, to confirm the general principle which suspends the run-

ning of the Statute of Limitations against the "enemy" while that status exists. First National Bank of Pittsburgh v. Anglo-Oesterreichische Bank, 3 Cir., 37 F.2d 564, 567.

■ Defendant also argues that the date of the formal surrender of Japan, September 2, 1945, which we selected for the lifting of the suspension of the Statute of Limitations was too remote, and has presented two earlier dates for our consideration. The first of these dates is May 25, 1945, when the Secretary of the Treasury, acting pursuant to the authority vested in him by the Trading With The Enemy Act, supra, issued General Ruling 18, 10 F.R. 6170, 31 C.F.R. § 131 (1945 Supp.), which, according to defendant, had the effect of removing the liberated portions of the Philippine Islands from the designation of "enemy territory." This, defendant insists, made possible the immediate resumption of normal trade and business intercourse between the United States and the Philippine Islands.

We are unable to attribute such a far-reaching result to General Ruling 18 for several reasons. In the first place, General Ruling 18 does not purport to remove the Philippine Islands from the designation of "enemy territory" for the purpose of authorizing trading, but rather, its purpose is to redefine the status of the Philippines with respect to the freezing regulations previously imposed upon certain types of property located therein. Section (a) of the Ruling makes this clear in stating as follows:

"(a) *Status of the Philippine Islands under the freezing regulations.* For the purpose of administering the freezing regulations and complying with the provisions thereof:

"(1) The liberated portions of the Philippine Islands hereafter shall be included within the term 'United States' as defined in paragraph B of section 5 of the order and shall not be included within the term 'foreign country' as defined in paragraph D of section 5 of the order;

"(2) Any portions of the Philippine Islands controlled or occupied by the military, naval or police forces or other authority of Japan shall immediately upon liberation thereof be included within the term 'United States' and shall cease to be included within the term 'foreign country.'"

In the second place, Section (a) of the Ruling provides that only the liberated portions of the Philippine Islands are relieved of the operation of the freezing regulations as of May 25, 1945, and that the remaining portions of the Philippines shall be so relieved upon the date of their liberation. Thus, it is apparent that instead of adopting the date of the issuance of General Ruling 18 as urged by defendant, we would have to adopt the very terms of Section (a) itself in order to have a basis for which to determine when the lifting of the suspension of the Statute took place. In so doing we would involve ourselves in the complex problem of determining different dates for the lifting of the suspension for the various claimants depending upon which island they resided in. Even defendant is forced to concede that such a decision would impose upon us an impractical and virtually unworkable rule. Moreover, Section (b) of General Ruling 18 provides that the status of the individual Filipinos is not affected by the removal of the freezing regulations from the liberated islands, and that unless they are licensed as a generally licensed national in accordance with the Trading With The Enemy Act, they will continue to be deemed nationals of a blocked country. Hence, we might even have to determine when individual litigants were relieved of the operation of this Section.

Instead of becoming involved in the many refinements which would necessarily follow the adoption of the terms of General Ruling 18 as marking the lifting of the suspension, we believe it is far more desirable to adopt the one date, September 2, 1945, which uniformly marks the restoration of the right of free commercial intercourse, and of access to this court, to every Filipino in all parts of the several Philippine Islands.

The second date which defendant suggests would fulfill the necessary qualifications is July 5, 1945. On this day General

MacArthur and President Osmena of the Philippines each issued statements officially proclaiming the complete liberation of the Philippine Islands. Philippine Official Gazette, Vol. 41, No. 4, pp. 289–290. Defendant again insists that normal relations between the United States and the Philippines were resumed following this occasion, which is two months prior to the September 2, 1945 date named by us as marking the resumption of these activities.

While the liberation of the islands appears to have been sufficiently advanced to justify the issuance of such proclamations for political and military purposes, we find that the complete liberation was not accomplished at this time, and that many areas and many persons continued to be subject to the control of elements of the Japanese Army until the Japanese Government formally surrendered to the United States on September 2, 1945. Army General Order 105, November 19, 1945, which defines time limitations for the various Philippine battle campaigns, reveals the true state of affairs existing in the Philippine Islands. This order contains the following statement:

> "Note.—Battle participation credit for this campaign may be awarded by the theater commander to units or individuals who actually engaged the enemy after the closing dates, 1 July 1945 and 4 July 1945, respectively."

Furthermore, a complete resumption of commercial intercourse was not possible on July 5, 1945, because the war with Japan continued in other areas of the Pacific theater of operations with the result that the wartime restrictions on private shipping remained in force and sea lanes remained closed to private traffic. Hence, we repeat our earlier conclusion that the first date which, in the interest of uniformity and fairness to all residents of the Philippine Islands, may be selected for the lifting of the suspension of the normal operation of the Statute of Limitations is September 2, 1945.

Plaintiff has once again presented arguments concerning the further suspension of the Statute of Limitations during the pendency of his claim before the Army Claims Commission. Inasmuch as all of these arguments have been considered at length in our decision in a companion case to the present action, Tan v. United States, supra, there is no point in discussing them further. Accordingly, defendant's motion for rehearing is denied, and this action is remanded to a commissioner for proceedings on the merits of plaintiff's claim.

It is so ordered.

JONES, C. J., and MADDEN and LITTLETON, JJ., concur.

WHITAKER, Judge (dissenting).

The distinction which the majority attempts to make between a so-called war disability and a legal disability is to me a distinction without a difference. The law, to wit, the Trading With The Enemy Act, prohibited plaintiff from suing. If this is not a legal disability, I do not know how you could have one.

The law prohibits an insane person to sue, it prohibits a minor to sue, etc., because they are supposed to be incompetent to act intelligently. Plaintiff here was prohibited by law to act at all; but it is by law that all of them are disabled to sue.

In my former dissent in this case, I was under the impression that this suit was brought when section 262 of Title 28 U.S.C. (1946 Ed.) 36 Stat. 1139, was in effect. I now find I was then in error; but even under that statute I thought a person denied access to the courts because of war should not have a longer period within which to bring his suit than a person under one of the disabilities enumerated in that statute.

Now I find that section 2501 of revised Title 28 (1948 Ed.) was in effect when this suit was brought. Section 2501 does not enumerate the disabilities which permit a person to sue within three years after the disability is removed, whether or not this is longer than six years after the cause of action accrued, but it says that "a person under legal disability" may sue within three years after the disability ceases.

I have no doubt that under this section plaintiff had only three years after the disability was removed within which he might have brought his suit, if the six-year limitation had expired before.

That plaintiff was under a "legal disability" is easily demonstrable. Section 3(a) of the Trading With The Enemy Act, 40 Stat. 411, 50 U.S.C.A.Appendix, § 1 et seq., prohibits a person in enemy territory "to trade" with anyone in the United States. The act contained a prohibition forbidding any person in the United States to "complete, or perform any contract, agreement, or obligation," and "to have any form of business or commercial communication or intercourse" with a person in enemy-occupied territory.

The inhabitants of the Philippine Islands became alien enemies under the Trading With The Enemy Act on December 8, 1941. Section 2 of the Trading With The Enemy Act defines an "enemy" as:

> "(a) Any individual * * * resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war * * *."

The courts have construed this to include even citizens of the United States who were resident within enemy territory. Salvoni v. Pilson, 86 U.S.App.D.C. 227, 181 F.2d 615, certiorari denied, 339 U.S. 981, 70 S.Ct. 1030, 94 L.Ed. 1385; United States v. Krepper, 3 Cir., 159 F.2d 958, certiorari denied 330 U.S. 824, 67 S.Ct. 865, 91 L.Ed. 1275.

Plaintiff's cause of action arose after December 8, 1941. Not until the Philippine Islands were liberated from Japanese control was plaintiff able to sue because of the legal disability imposed upon him by the Trading With The Enemy Act.

Plaintiff's case, therefore, it seems to me, comes necessarily within the provision of section 2501 which permits him to file his petition "within three years after the disability ceases." Plaintiff's petition was filed long after this three-year period and, therefore, was barred by the statute.